456 P.2d 757

**Vicky L. ADAMS, Plaintiff-Respondent,**

**v.**

**Donald L. ADAMS, Defendant-Appellant.**

**No. 10275.**

Supreme Court of Idaho.

July 3, 1969.

Donald L. Adams, pro se.

Daniel A. Quinlan, Lewiston, for appellee.

McQUADE, Justice.

Vicky L. Adams and Donald L. Adams were married at Lewiston, Idaho, on August 29, 1959. One child, Michele, was born of this marriage, and she is now approximately seven years old. On July 26, 1965, Mrs. Adams brought an action against her husband for divorce, and on September 9, 1965, a default divorce decree was entered on the grounds of extreme cruelty. This decree: (1) awarded custody of the child, Michele Adams, to Mrs. Adams, subject to Mr. Adams' reasonable visitation rights; (2) ordered Mr. Adams to pay $50 per month on the tenth of each month as support for the child during her minority; (3) awarded Mrs. Adams as her separate property: (a) the equity in the Lewiston home, (b) the household fixtures and appliances with their indebtedness to be assumed by Mr. Adams, and (c) the family car with its indebtedness of $850 to be assumed by Mr. Adams; (4) ordered Mr. Adams to maintain his two existing life insurance policies and to make his child, Michele, the beneficiary of each; (5) ordered Mr. Adams to pay Mrs. Adams' attorney fees of $40.

After the divorce, Mrs. Adams was remarried to a Mr. David Bishop, a structural engineer, and they now live with Mrs. Adams' child, Michele, in Spokane, Washington. It appears that the child, Michele, as well as having begun school in Spokane, has become interested in various organized summer recreational activities in Spokane such as swimming. Mr. Adams, on the other hand, remarried in September of 1966 and was again divorced in November of 1966. After a sojourn in California, Mr. Adams was married to his present wife in April of 1967. They now live with one child of their own and two children of the present Mrs. Adams' former marriage in a house trailer in Kent, Washington, near Seattle. Mr. Adams is the manager of a mobile home business there.

On February 16, 1968, Mr. Adams petitioned the court for a modification of the divorce decree on the grounds that the former Mrs. Adams had refused to allow the exercise of visitation rights and had maligned Mr. Adams in the child's presence. Mr. Adams asked for transfer of the custody of the child to himself or, alternatively, for redefinition of visitation rights to include visitation at all reasonable times and having the child with him for one-half the summer and on alternate holidays.

The hearing before the court in April of 1968 tended to show the following facts. Directly after the parties' separation, Mr. Adams saw his child about three times a week. After the divorce he saw her every Sunday until both parties left Lewiston. He saw the child for Thanksgiving of 1966 (at the time when Mr. Adams' second wife was not living with him and was instituting the second divorce), for ten days in July of

1967, and in October, November and December of 1967. In short, Mr. Adams saw his child on each time he requested to see her, except on one occasion when he wanted the child to come to California for a week while he was working and where his mother would take care of the child.

On the other hand, Mr. Adams admitted that he was consistently late in making his support payments, once having been as much as six months behind. He failed to pay the indebtedness on the car and consequently the car was repossessed. Though not mentioned specifically in the divorce decree, Mr. Adams paid $576.66 on the Title I loan on the house and then refused to pay further, causing Mrs. Adams to pay $500 and leaving an unpaid balance of about $450.

These failures to meet his obligations caused Mrs. Adams to demand support payments before she would allow Mr. Adams to visit the child on several occasions. Mr. Adams provided very little substantiation of the allegation that Mrs. Adams maligned him in the presence of the child, and Mrs. Adams consistently denied doing so. Mr. Adams said that Mrs. Adams refused to let him talk to the child on the phone on one occasion, but this was controverted by Mrs. Adams' statement that she told him the child was swimming, and Mr. Adams did reach the child when he called back. Moreover, on one occasion Mr. Adams kept the child so long on a weekend in Kent, Washington, that the child was required to travel alone on a plane to Spokane which arrived at 2:30 a. m. in order to be able to attend school the next Monday. Mr. Adams admitted that Mrs. Adams was providing an excellent home for the child and was an excellent mother. On this evidence, the court concluded that there was only a small amount of hearsay that Mrs. Adams maligned Mr. Adams in the presence of the child, and that on the whole record there certainly was insufficient evidence to deprive her of custody of her daughter.

The court therefore issued the following order: (1) that the former Mrs. Adams was not in contempt of the visitation order contained in the divorce decree; (2) that Mr. Adams' petition for transfer of custody of the child to him be denied; (3) that Mr. Adams' petition for custody of the child for one-half the summer be denied; (4) Mrs. Adams' petition for an increase in child support payments be denied; (5) that Mr. Adams pay Mrs. Adams' counsel $250 attorney fees as well as the $40 still owing from the divorce decree; (6) that Mr. Adams pay Mrs. Adams the stipulated value of the repossessed car, or $850; (7) that Mr. Adams pay Mrs. Adams the $500 she was compelled to pay on the Title I loan and also pay the $450 balance; (8) that, as to visitation, Mr. Adams be allowed to have his child at his home on July 3–7, 1968, and December 27–30, 1968, and thereafter, conditional upon his maintaining a stable home, he have the child on July 1–15 of every year until further order of the court and for four days at Thanksgiving and Christmas, alternately each year, as well as reasonable non-overnight visits after advance notice in the city of Spokane. Mr. Adams has appealed.

Although appellant Mr. Adams was represented by counsel at the modification hearing, the district court granted counsel's motion to withdraw as counsel on appeal for "good cause." Mr. Adams appeared *pro se*, and thus his assignments of error are considered substantially rather than formally.

■ Appellant Mr. Adams first argues that the trial judge should have disqualified himself from hearing the modification petition because he was a personal friend of Mrs. Adams. We are unable to find any merit in this contention because there is not a shred of evidence in the record to indicate that the trial judge was a personal friend of Mrs. Adams or anything less than completely impartial in his disposition of the proceedings below.

■ Appellant next argues that the court erred in allowing Mrs. Adams to retain custody of her daughter, Michele, and in refusing to permit Mr. Adams to have

the child with him for a longer portion of every year. In this respect, I.C. § 32–705 provides:

> "*Custody of children.*—In an action for divorce the court may, before or after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper, and may at any time vacate or modify the same."

It has been often recognized that this provision commits questions of child custody to the sound legal discretion of the trial court, whose decisions will not be reversed except for abuse.[1] This rule applies as well to decisions granting or denying modification of child custody decrees.[2] The paramount consideration in every determination is the best interests of the children.[3] A petition for modification of a decree of child custody will not be granted unless the petitioner shows that a material, permanent and substantial change in the circumstances and conditions of the parties has occurred since the date of the original decree and that this change in turn makes a modification of the custody decree appear to be in the best interests of the child's welfare.[4]

■ In our application of these well-settled principles to the facts shown by the record in this case, we find that the decision of the district court respecting the custody of Michele Adams was proper. Appellant admitted that Mrs. Adams is an excellent mother and is providing an excellent home for their daughter. By contrast, appellant's record indicates some instability, and his ability to provide a home in the best interests of the child is much less certain. As to the type of visitation rights granted appellant, appellant has provided to this Court no evidence or reason which would justify our reversal of the decision below as an abuse of discretion.

Appellant does argue that Mrs. Adams maligned him in the presence of their child and thus alienated the affection of the child for him. If this were shown by the evidence clearly and substantially enough so that it could be deemed a material change in circumstances, then there could be good reason to modify the child custody decree. It is certainly not in the best interests of the child to be made the vehicle for recriminations between the divorced parents. Nor will the law sanction such unfortunate practices.[5] However, the factual support for such a conclusion in this case is flimsy. At most, Mrs. Adams may have called Mr. Adams an uncomplimentary name over the telephone which the child may have overheard. There was no evidence of any systematic effort on the part of Mrs. Adams to alienate the child's affection for her father. Mr. Adams complained of having to tender past-due support payments before he could exercise his visitation rights. However, the evidence does not indicate that these occurrences were translated into methods of alienating the child's affections for appellant. Nor did Mrs. Adams ever refuse reasonable visitation rights. The one request which was refused was also unreasonable. As in the *Stewart* and *Kalousek* cases, therefore, we

1. See, e. g., Tomlinson v. Tomlinson, 93 Idaho 42, 454 P.2d 756 (1969); Nielsen v. Nielsen, 87 Idaho 578, 394 P.2d 625 (1964); Fish v. Fish, 67 Idaho 78, 170 P.2d 802 (1946); Donaldson v. Donaldson, 31 Idaho 180, 170 P. 94 (1917).

2. *Tomlinson*, n. 1, *supra*; Larkin v. Larkin, 85 Idaho 610, 382 P.2d 784 (1963); Jeppson v. Jeppson, 75 Idaho 219, 270 P.2d 437 (1954); *Fish*, n. 1, *supra*.

3. See, e. g., *Tomlinson*, n. 1, *supra*; Angleton v. Angleton, 84 Idaho 184, 370 P.2d 788 (1962); Empey v. Empey, 78 Idaho 25, 296 P.2d 1028 (1956); Arkoosh v. Arkoosh, 66 Idaho 607, 164 P. 2d 590 (1945).

4. *Tomlinson*, n. 1, *supra*; Embree v. Embree, 85 Idaho 443, 380 P.2d 216 (1963); Maudlin v. Maudlin, 68 Idaho 64, 188 P.2d 323 (1948); *Fish* n. 1, *supra*.

5. See, e. g., Stewart v. Stewart, 86 Idaho 108, 383 P.2d 617 (1963); Kalousek v. Kalousek, 77 Idaho 433, 293 P.2d 953 (1956); Thurman v. Thurman, 73 Idaho 122, 245 P.2d 810, 32 A.L.R.2d 996 (1952).

find insufficient evidence for appellant's contention that an alienation of the child's affection for him must operate to deprive Mrs. Adams of custody of their daughter.

■ We come then to two financial matters. First, appellant argues that the court erred in requiring him to pay the so-called Title I loan in full. In the order from which appellant appeals, the court stated that this " * * * title loan was found by the Court to have been a community indebtedness of the parties and which the defendant, Donald L. Adams, should have paid under the provisions of the Divorce Decree of September 9, 1965." The divorce decree had awarded Mrs. Adams "[t]he parties['] equity in the dwelling house and lot * * * [in relation to which the Title I loan was made]." As to household goods, fixtures and appliances and the family car, the divorce decree also gave these to Mrs. Adams and ordered appellant to assume any indebtedness to which these items were subject. It appears, therefore, that the court intended throughout to make appellant responsible for the payment of all community debts, of which the Title I loan was one. We cannot say this disposition was improper.[6]

■ Finally, appellant argues that the court erred in requiring him to pay the attorney fees of Mrs. Adams. However, as respondent notes, the testimony of Mrs. Adams concerning her inability to pay for counsel retained to defend against Mr. Adams' modification petition was uncontradicted. Under I.C. § 32–704, the award of attorney fees to the wife is discretionary with the court. That statute has been held applicable to modification proceedings.[7] We cannot find the award improper.

The order appealed from is affirmed. Costs to respondent.

McFADDEN, C. J., and DONALDSON and SPEAR, JJ., concur.

SHEPARD, Justice (dissenting).

I dissent from that portion of the majority opinion affirming the lower court's order that the appellant herein pay the Title I loan. The majority opinion infers that the intent of the original divorce decree was to require the appellant to make such payment. I cannot agree. The original divorce decree awarded the respondent wife all of the household goods, fixtures and appliances, and required the appellant to pay all indebtedness against them. Respondent wife was awarded an automobile which was also subject to indebtedness, which the appellant was ordered to pay. Appellant was further required to maintain certain life insurance policies in force and to make the minor child the beneficiary of such policies. As to the dwelling of the parties, the respondent wife was awarded the "equity" therein. I believe the majority opinion misconstrues the intention of the court as indicated in the divorce decree. That court, in detail and with specificity, made clear its intent as to the requirements imposed upon the appellant husband. The contrast between the divorce decree's treatment of all other types of indebtedness and its treatment of the residential indebtedness creates an inference exactly the opposite of that gained by the majority opinion. While a Title I loan does not result in an indebtedness against property in the conventional sense, it ordinarily results in an improvement to real property and presumably an enhancement in the value thereof. This improvement and enhancement in value, if any there was, inured to the benefit of the respondent wife, who the record shows has remarried and no longer occupies the residence. There is no showing in the record that the monies procured as a result of the Title I loan were utilized in any way other than improvements to the real property. Based on the above, I interpret the decree of the trial court as awarding the residence to the respondent wife and relieving

6. I.C. § 32–712(1).

7. Embree, n. 4, *supra*; Wright v. Wright, 76 Idaho 393, 283 P.2d 1101 (1955); Gif-

ford v. Gifford, 50 Idaho 517, 297 P. 1100 (1931).

the appellant husband of any further obligation in connection therewith. While I concede that a husband is responsible for the community debts, I suggest that the present question is substantially different than that of a husband being required to pay commmunity indebtedness such as medical bills, grocery bills, clothing bills, or other ordinary expenses of the community arising during the course of the marriage. I concur in the remainder of the majority opinion.